**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (State Bar No. 324525)
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: sbogdanovich@bursor.com
        idiaz@bursor.com

**BURSOR & FISHER, P.A.**
Alec M. Leslie (*pro hac vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: aleslie@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH CORREIA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LULU & GEORGIA, INC.<br><br><br>Defendant. | Case No. **'26 CV 1186 GPC JLB**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Elizabeth Correia ("Plaintiff") files this class action individually and on behalf of all others similarly situated (the "Class Members") against Defendant, Lulu & Georgia, Inc. ("Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of her undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action brought against Lulu & Georgia for allowing third-party companies to customers' actions on its website, www.luluandgeorgia.com/ (the "Website"), even after customers asked not to be tracked.

2.      Lulu & Georgia is an interior home décor company, specializing in providing "designer collaborations," "curated collections," and "one-of-a-kind vintage pieces" for consumers to choose from.[1] Customers can shop for and buy items through the Website. However, Defendant implemented tracking code on its website that enabled Google LLC ("Google"), HubSpot, Inc. ("HubSpot"), and Meta Platforms, Inc. ("Meta") (collectively, the "Third Parties"), to collect and intercept customers' communications with Defendant.

3.      Defendant leads its consumers to believe it values their privacy by being transparent of its use of cookies and tracking technologies on its Website, and purporting to give consumers a "choice" to opt out of cookies that track their behavior on the Website.



---

[1] LULU & GEORGIA, https://www.luluandgeorgia.com/pages/about-us.

1
2
3
4
5
6
7
8
9
10
11



12    4.    But Defendant's transparency and provision of consumer "choice" in

13  their data privacy is a sham, designed to give Website customers an illusion of

14  choice.  In fact, when customers click the "Reject All" button on this banner,

15  Defendant continues to allow the third-parties to track them anyway. Indeed, the

16  third-parties even capture the fact customers clicked the "Reject All" button, as well

17  as their subsequent shopping activities on the Website.

18
19
20



21
22
23
24
25
26
27
28

5.    Defendant therefore "aids, agrees with, employs, or conspires" to permit the Google, HubSpot, and Meta to read, attempt to read, learn, and/or use the confidential communications of Website visitors without prior consent, thus violating the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631(a) and 632.

6.    Plaintiff brings this action individually and on behalf of all California and Nationwide residents who browsed for products on the Website, opted out of Defendant using tracking cookies, and whose electronic communications were nonetheless intercepted or recorded by the Third Parties.

## THE PARTIES

*Plaintiff*

7.    Plaintiff Elizabeth Correia is an adult citizen of the state of California and resides in Cardiff by the Sea, California.

8.    Plaintiff Correia visited Defendant's Website between December 11, 2025, and December 26, 2025, while located in California.  Plaintiff estimates her visit date based on retargeting emails she received from Defendant urging her to purchase some of the particular rugs she viewed on the Website, which were sent to her shortly after her visit to the Website. A more precise date on which Plaintiff visited the Website cannot be determined at this stage without engaging in discovery.

9.    When Plaintiff Correia entered Defendant's Website, Defendant displayed a pop-up privacy banner informing Plaintiff the Website used cookies and other tracking technologies, and providing an option for Plaintiff to adjust the cookie settings. Plaintiff opened the cookie settings and rejected the optional tracking cookies.

10.    After adjusting these privacy settings, Plaintiff continued to browse the Website. Plaintiff browsed for rugs and viewed several rug listings on the Website. She also conducted a search on the Website's search bar for "rugs".

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    3

11.     Plaintiff's communications with Defendant – including the search terms she entered into the Website's search bar, the specific products she viewed, and items she added to her cart – were intercepted in transit by Google, HubSpot, and Meta, as enabled by Defendant.

12.     Defendant did not obtain Plaintiff's prior consent to this interception on the Website. In fact, Defendant led Plaintiff to believe she could reject or opt out of these interceptions by displaying the cookie pop-up banner that Plaintiff used to reject Defendant's use of cookies and tracking technologies. But instead of respecting Plaintiff's data privacy choices, Defendant still allowed the Third Parties to intercept Plaintiff's communications, in direct contravention of Plaintiff's wishes and instructions to Defendant.

13.     Plaintiff had a reasonable expectation of privacy over her communications with Defendant because she explicitly instructed Defendant not to use tracking cookies and tracking technology while Plaintiff used the Website when she rejected Defendant's use of cookies and tracking technologies via Defendant's cookie pop-up banner on the Website.

14.     Plaintiff has visited the Website on the same web browser she was logged into her Google account on.

*Defendant*

15.     Defendant Lulu & Georgia, Inc. is a California corporation with its principal place of business in Los Angeles, California.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed classes are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed classes is a citizen of a state different from Defendant.

17.    The Court has general personal jurisdiction over Defendant because its principal place of business is in California and is thus at home in California.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because as substantial portion of the events giving rise to this action occurred in this District. In particular, Plaintiff was located in this District when she visited the Website and Defendant enabled the Third Parties to intercept her communications with Defendant via the Website.

## FACTUAL ALLEGATIONS

### I.    OVERVIEW OF GOOGLE'S TRACKING TOOLS

19.    Defendant has purposefully installed Google's tracking tools on its Website. Therefore, Defendant has enabled Google to intercept Plaintiff's and Class Members' communications by employing its tracking tools on its Website in the manner described throughout this Complaint.

20.    Google offers a range of advertising software, one of which is called Google Analytics.

21.    "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights" for businesses.[2] This is made possible by the Google Analytics software, a piece of code installed on a website that collects information on how website users interact with a business's website, such as "how many users bought an item ... by tracking whether they made it to the purchase-confirmation page."[3]

22.    Google advertises this service can "[m]onitor activity on your site as it happens."[4]

---

[2] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/jk12159447?hl=en&ref_topic=14089939&sjid=2827624563183915220-NC.
[3] Id.
[4] GOOGLE, THE FINER POINTS, https://marketingplatform.google.com/about/analytics/features/.

---

23.     Google's business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the Google Analytics software.

24.     Thus, through websites that employ Google's services, Google directly receives the electronic communications of website visitors entered into websites via website features like search bars.

25.     Specifically, "[a]mong other pieces of information, Google Analytics sends the page URL and page title to Google in an AJAX request … an AJAX request provides more information than would be sent by loading a third-party resource only."[5]

26.     An example illustrates how Google Analytics works. Take an individual who navigates to Defendant's Website and clicks on a particular rug to view. When the individual goes on the webpage to view the particular rug, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because Defendant utilizes Google Analytics, Google's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Google causes the browser to simultaneously, contemporaneously and covertly duplicate the communication with Defendant (the full-string URL containing the name of the product the individual is viewing), transmitting it to Google's servers, alongside additional information that transcribes the communication's content and the individual's identity. The data transmissions described herein occur concurrently with each user's activity, enabling Google to intercept sensitive data as it is generated.  In other words, Google's interception of users' communications on the Website occurs "in transit."

---

[5] Mingjia Huo, Maxwell Bland & Kirill Levchenko, *All Eyes On Me: Inside Third Party Trackers' Exfiltration of PHI from Healthcare Providers' Online Systems*, (2022) ACM 197, 202, https://dl.acm.org/doi/abs/10.1145/3559613.3563190.

27.     That information is then analyzed by Google before being provided to any entity that was a party to the conversation (like Defendant). Upon information and belief, in order to analyze the intercepted communications, Google views the intercepted communications. As such, on information and belief, Google viewed Plaintiff and Class Members' communications with Defendant in order to provide advertising services to Defendant.

28.     Once Google intercepts website communications, it has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[6]

29.     Google's range of software services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits. This involves collecting visitor information from thousands of websites and then analyzing that information in order to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

30.     Google achieves this targeted advertising by collecting certain data from users while they navigate a website that utilizes Google Analytics, such as Defendant's Website. For example, through the Website which hosts the Google Analytics code, Google Analytics places the _ga cookie on a user's browser.

---

[6] GOOGLE, GOOGLE PRIVACY AND TERMS, https://policies.google.com/technologies/partner-sites.

---

31.    Google and its clients, such as Defendant, use the _ga cookie to "distinguish unique users."[7] In other words, the _ga cookie will identify users and associate actions a person takes on a website to them.

32.    But beyond the use of cookies, like _ga, to identify individuals and attribute their online actions to them, Google also engages in browser fingerprinting to personally identify individuals.

33.    "Browser fingerprinting is the process of quietly analyzing the unique configuration of a user's web browser when it connects to a website. This fingerprint goes beyond the browser itself, it includes details such as installed languages, operating system, plugins, and time zone, among others. Combined, these attributes form a highly (though not perfectly) unique identifier that helps verify returning users[.]"[8] Since "[e]ach user's software and hardware setup is unique …, this configuration acts like a digital ID that helps verify returning users. Once you have identified the user, you can track their movements across [a] site."[9]

34.    In an effort to transition away from the use of cookies, but maintain ad targeting capabilities in an "ad-supported internet[,] … Google has introduced digital fingerprinting."[10] "[O]rganizations that use [Google's] advertising products can use fingerprinting techniques[.]"[11]

35.    What Google's shift means for internet users, such as users visiting the Website, is that "advertisers can now use digital fingerprinting techniques with fewer

---

[7] GOOGLE, *[GA4] Cookie usage on websites*, https://support.google.com/analytics/answer/11397207?hl=en

[8] Marco Crispin, *What is Browser Fingerprinting & How Does It Work?*, https://seon.io/resources/browser-fingerprinting/.

[9] *Id.*

[10] Pieter Arntz, *Google now allows digital fingerprinting of its users,* https://www.malwarebytes.com/blog/news/2025/02/google-now-allows-digital-fingerprinting-of-its-users.

[11] *Id.*

restrictions [as compared to cookies], allowing them to build richer, more detailed profiles of users across multiple platforms. No cookies required."[12]

36. Google's browser fingerprinting aids with targeted advertising by allowing advertisers to "create hyper-specific audience segments based on everything from device specifications to browsing behavior. This leads to higher conversion rates."[13]

37. Information from websites, like Defendant's Website, is central to Google's ability to successfully market its advertising capabilities to future clients. Google's ability to personally identify users, leads to "[m]ore precise targeting [and] equals better ROI for advertisers, which translates into increased revenue for Google."[14]

38. Google views the contents of the communications it intercepts in order to engage in its analyzation of the data. Google states that once the Google Analytics code on a website "collects data, it packages that information up and sends it to Google Analytics to be processed into reports. When Google Analytics processes data, it aggregates and organizes the data based on particular criteria."[15]

39. In sum, Google has the capability to use the communications it intercepts for own purposes other than simply providing a recording to its customers, including but not limited to (i) improving its own products and services; (ii) developing new Google for Business and Google Analytics products and services; and (iii) analyzing website visitors' communications to assist with and data analytics and targeted advertising.

---

[12] Atomic Mail, *How Google Tracks You? Digital Fingerprinting Update in 2025*, https://atomicmail.io/blog/how-google-tracks-you-using-digital-fingerprinting.

[13] *Id.*

[14] *Id.*

[15] GOOGLE, *How Google Analytics Works*, https://support.google.com/analytics/answer/12159447?hl=en#.

---

## II.    OVERVIEW OF THE HUBSPOT TRACKING CODE

40.    Defendant has purposefully installed HubSpot's tracking tools on its Website. Therefore, Defendant has enabled HubSpot to intercept Plaintiff's and Class Members' communications by employing its tracking tools on its Website in the manner described throughout this Complaint.

41.    HubSpot provides tracking code that can be installed on a webpage to capture information about website users' visit to a website.  This includes collecting website page views, through full-string URLs, data entered into website forms, IP addresses, and online identifiers.[16]

42.    HubSpot tracks users' actions on a website and associates all actions a user takes on a Website, including communications, to a particular user by using tracking cookies on users' browsers.[17]  "If and when a visitor fills out a form, HubSpot will associate their previous page views based on the tracking cookie. If the email address filled in the form is associated with an existing contact, this visitor will be identified as the contact."[18]

43.    HubSpot's tracking, and therefore, interception of users' communications on a website occurs as the communications happen. An example illustrates how the HubSpot tracking code works. Take an individual who navigates to Defendant's Website and clicks on a particular rug to view. When the individual goes on the webpage to view the particular rug, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.

---

[16] HUBSPOT, *Data Collected by the HubSpot Tracking Code*, https://knowledge.hubspot.com/reports/data-collected-by-the-HubSpot-tracking-code?hubs_content=knowledge.hubspot.com/account/how-does-hubspot-track-visitors&hubs_content-cta=data-thats-collected-by-the-hubspot-tracking-code.

[17] HubSpot, *Track Visitors in HubSpot*, https://knowledge.hubspot.com/account/how-does-hubspot-track-visitors.

[18] *Id.*

---

44.    Because Defendant utilizes HubSpot's embedded tracking code, the HubSpot tracking code sends secret instructions back to the individual's browser, without alerting the individual that this is happening. HubSpot causes the browser to simultaneously, contemporaneously and covertly duplicate the communication with Defendant (the full-string URL containing the name of the product the individual is viewing), transmitting it to HubSpot's servers, alongside additional information that transcribes the communication's content and the individual's identity. The data transmissions described herein occur concurrently with each user's activity, enabling HubSpot to intercept sensitive data as it is generated.  In other words, HubSpot's interception of users' communications on the Website occurs "in transit."

45.    That information is then analyzed by HubSpot before being provided to any entity that was a party to the conversation (like Defendant). Upon information and belief, in order to analyze the intercepted communications, HubSpot views the intercepted communications. As such, on information and belief, HubSpot viewed Plaintiff and Class Members' communications with Defendant in order to provide advertising services to Defendant.

46.    HubSpot's consumers, such as Defendant, then enable HubSpot to use website user data collected from websites for marketing purposes, such as targeted advertisement, connecting other third party ad accounts, such as Facebook, Google, and LinkedIn, and creating user segments.[19]

47.    When HubSpot' tracking code is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, HubSpot involves a separate and distinct third-party entity from the parties in the conversation, using HubSpot's tracking code to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because HubSpot itself is collecting the content of any conversation in real time and viewing each and every

---

[19] *HubSpot*, Market Your Business to Generate Leads, https://knowledge.hubspot.com/get-started/market-your-business.

piece of information collected.  That information is then analyzed by HubSpot before being provided to any entity that was a party to the conversation (like Defendant).

48.    Once HubSpot intercepts the Website communications, it has the ability to use such information for its own purposes.  HubSpot's services are based on HubSpot's ability to collect and analyze consumer's web behavior and deliver that information to present and future customers (*i.e.*, to collect information from one customer's users and disclose that same information to other customers), who use that information for targeted advertising and product optimization.

49.    HubSpot admits to using data collected from its consumers' websites, like Defendant's Website, through the HubSpot tracking code, for its own purposes. That includes "to improve Hubspot's products and services, including the Breeze Intelligence commercial dataset" and "HubSpot's buyer intent product."[20] HubSpot's Breeze Intelligence is an AI-powered tools that enable HubSpot's customers to continuously and automatically enrich the consumer data they have. That includes evaluating buyer intent, building targeted marketing campaigns, personalizing consumer interactions on a website, among other information.[21] Although a HubSpot customer may not use Breeze Intelligence on their website, HubSpot may nonetheless use data collected from that customer's website to improve its AI features.[22]

50.    In sum, HubSpot has the capability to use website communications to: (i) improve its own products and services; (ii) develop new products and services;

---

[20] HUBSPOT, *Install the HubSpot Tracking Code*, https://knowledge.hubspot.com/reports/install-the-hubspot-tracking-code?hubs_content=knowledge.hubspot.com/account/how-does-hubspot-track-visitors&hubs_content-cta=hubspot-tracking-code; *supra* note 16.

[21] HUBSPOT, *Understand Breeze*, https://knowledge.hubspot.com/ai/understand-breeze.

[22] *Supra* notes 16, 19, 20.

and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

## III.    OVERVIEW OF THE META PIXEL

51.    Defendant has purposefully installed Meta's tracking pixel, the Meta Pixel, on its Website.  Therefore, Defendant has enabled Meta to intercept Plaintiff's and Class Members' communications by employing its tracking tools on its Website in the manner described throughout this Complaint.

52.    Facebook, owned by Meta, describes itself as a "real identity platform,"[23] meaning users are allowed only one account and must share "the name they go by in everyday life."[24]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[25]

53.    Meta sells advertising space by highlighting its ability to target users.[26] Meta can target users so effectively because it surveils user activity both on and off its site.[27]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[28]  Meta

---

[23] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021), https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701?gaa_at=eafs&gaa_n=ASWzDAgBv80qmBk-eG84pjjaXQ_mKin6qQt2xKdYqf7uQnwVhlfB1FJcBH2IlXX7L8Q%3D&gaa_ts=688a0799&gaa_sig=jHy6omcjq_GiHNtDoU8ZxHL8K22doiw4-dodRtswq4rYDH1pK9mDK0B06csW-y2S7xLvXHKhIeRggAdBGESBzQ%3D%3D.

[24] META, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[25] META, SIGN UP, https://www.facebook.com/.

[26] META, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[27] META, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[28] META, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

---

compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[29]

54.    Advertisers can also build "Custom Audiences."[30]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[31]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[32]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[33]

55.    As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and

---

[29] META, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[30] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[31] META, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[32] META, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[33] META, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook, Create a Website Custom Audience, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

---

services."[34]  Put more succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

56.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[35]  Meta's Business Tools can also track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[36]  Advertisers can even create their own tracking parameters by building a "custom event."[37]

57.    A popular Business Tool is the Meta Tracking Pixel (the "Meta Pixel").  Meta offers this piece of code to advertisers, like Defendant, to integrate into its website.  The Meta Pixel "tracks the people and type of actions they take."[38]

58.    An example illustrates how the Meta Pixel works. Take an individual who navigates to Defendant's Website and clicks on a particular rug to view. When the individual goes on the webpage to view the particular rug, the individual's

---

[34] META, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[35] *See* META, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[36] META, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[37] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[38] META, RETARGETING, https://www.facebook.com/business/goals/retargeting.

---

browser sends a GET request to Defendant's server requesting that server to load the particular webpage.

59.    When a user accesses a website hosting the Meta Pixel, Meta's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Meta's servers.  This secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Meta Pixel is configured to collect.  This transmission is initiated by Meta code and concurrent with the communications with the host website. In other words, Meta's interception of users' communications on the Website occurs "in transit."

60.    After collecting and intercepting website users information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. In order to engage in the above-described processing, analysis, and assimilation, on information and belief, Meta has to view the information being processed, analyzed, and assimilated. As such, upon information and belief, Meta regularly viewed and used Plaintiff and Class Members' communications that it intercepted via the Meta Pixel.

61.    Each time Defendant sent this activity data, it allowed Meta to intercept user's personally identifiable information, including their Facebook ID ("FID").  A FID is a unique and persistent identifier that Facebook assigns to each user.  With it, any ordinary person can look up the user's Facebook profile and name.  Notably, while Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID.  Meta admits as much on its website.  Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

62.    A user who accessed Defendant's Website while logged into Facebook transmitted what is known as a "c_user cookie" to Meta, which contained that user's unencrypted Facebook ID.

63.     When integrated and embedded into a website, the Meta Pixel is not akin to a tape recorder or a "tool" used by one party to record the other.  Instead, the Meta Pixel involves Meta, a separate and distinct third-party entity from the parties in the conversation, using the Meta Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because Meta itself is collecting the content of any conversation.  That information is then analyzed by Meta before being provided to any entity that was a party to the conversation (like Defendant).

64.     Once Meta intercepts website communications, it has the capability to use such information for its own independent purposes.  In 2021, Meta generated over $117 billion in revenue.[39]  With respect to the apps offered by Meta, substantially all of Meta's revenue is generated by selling advertising space.[40] Meta sells advertising space by highlighting its ability to target users by including them in the Core Audiences and Custom Audiences offered to its clients.[41]

65.     In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that Meta can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing Meta to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new Meta Business Tools products and services, or improve pre-existing Meta Business Tools products and services.

66.     The Meta Pixel code enables Meta not only to help Defendant with advertising to its own users outside the Website but also includes users among

---

[39] META, META ANNUAL REPORT 2021, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2023/2021-Annual-Report.pdf at 51.

[40] *Id.* at 63.

[41] META, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

groups targeted by *other* Facebook advertisers relating to interior décor products about which Defendant's users communicated on Defendant's Website.

67.    Meta's Business Help Center explains:

> Meta uses *marketing data to show ads to people who are likely to be interested in them.* One type of marketing data is website events, which are actions that people take on your website.[42]

68.    In other words, Meta sells advertising space by highlighting its ability to target users.[43] Meta can target users so effectively because it surveils user activity both on and off its site.[44] This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and connections.[45]

## IV.    LULU & GEORGIA ENABLES THE THIRD PARTIES' INTERCEPTION OF ITS WEBSITE USERS' COMMUNICATIONS

69.    Lulu & Georgia has integrated the Third Parties' Tracking Code into its Website. By integrating the Tracking Code into its Website code, Defendant has enabled the Third Parties to intercept Website users' communications with Defendant as users search and browse for products without users' consent. Further, Defendant has enabled the Third Parties to personally identify users, such as Plaintiff, via the _ga cookie, HubSpot cookies, browser fingerprinting, and/or FID, to effectuate targeted advertising related to Plaintiff's and other Website users' actions and communications on the Website.

---

[42] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

[43] META, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[44] Meta, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[45] Meta, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

---

70.    The following illustrates how Defendant enabled the Third Parties' interception of Plaintiff and other Website users' communications with Defendant via the Website.

71.    When a user conducts a search, views particular products, or initiates the checkout process for any product on the Website—communicating with Defendant that they are interested in a particular product—because Defendant installed the Tracking Code on its Website, the Third Parties collect the URL for the page the user is accessing on the Website and thus intercepts the contents of the user's communications with Defendant.

72.    For example, when a user searches for "blue rug" on the Website, Google Analytics intercepts this communication by collecting the URL of the web page which includes the exact search term the user communicated to Defendant. *See* Figure 1.



***Figure 1***

73.    Liwise, HubSpot also intercepts users' searches on the Website. *See* Figure 2.



***Figure 2***

74.    Further, when a Website user views a particular item, Defendant enables Google and HubSpot to collect the URL for the page the user is accessing on the Website. The URL includes the name of the particular product the Website user is viewing and thus, the Third Parties intercept the contents of the user's communications with Defendant. *See* Figures 3 and 4.



***Figure 3***



***Figure 4***

75.     Then, when a user decides to purchase an item and initiates the checkout process, Meta intercepts the name of the product and the price of the product the user has initiated checkout for, through an "Initiate Checkout" event. *See* Figure 5.



***Figure 5***

### III. SEARCH TERMS, PRODUCTS VIEWED, AND ITEMS BEING CHECKED OUT ARE COMMUNICATIONS.

76. Users' search terms, products viewed/browsed, and items being checked out on the Website are communications that are a product of users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated).

77. The names of products users search for, views, and decides to proceed to checkout on the Website are personal information because they "divulge a user's personal interests, queries, and habits." *See In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d at 605 (9th Cir. 2020).

### VI. DEFENDANT CONTRAVENED PLAINTIFF AND CLASS MEMBERS' EXPLICIT INSTRUCTIONS TO NOT ALLOW TRACKING BY THIRD PARTIES ON THE WEBSITE.

78. Defendant allows the Third Parties to intercept Plaintiff and Class Members' confidential communication without obtaining their consent.

79. Worse yet, Defendant leads consumers to believe that they have the choice to opt out of Defendant's use of tracking cookies and tracking technologies such as the Tracking Code.

80. This is because when a user first visits the Website, Defendant displays a cookie banner titled "We value your privacy." *See* Figure 6.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**We value your privacy.**                    ✕

This website uses cookies and tracking technologies for
navigation, analysis, and personalized ads, as detailed in
our Privacy Policy. Manage preferences via "Cookie
Settings." Use of this website confirms your acceptance
of our Terms of Use.

**Cookie Settings**

***Figure 6***

However, it bears noting that this cookie banner "actively misleads the customer.
The block of bold text" at the top of the banner simply says **We value your privacy**.
*Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016).

81.    A consumer reading this large, dark, bold "**We value your privacy**"
text may reasonably interpret that to mean they are *not* being tracked, and click "x"
to close the banner.  The text disclosing the website's use of cookies appears in much
smaller font, is not bolded, and appears in a fainter grey type that blends into the
background.  Even assuming a consumer notices this fine print text, the banner still
does not give them the option to reject the cookies. Instead, they must click the
"Cookie Settings" button and go to another page, and then click the "Reject All"
button. *See* Figure 7.



***Figure 7***

82.     But when users explicitly reject Defendant's use of optional targeting technologies, as Plaintiff did, Defendant *still* continues to allow the Third Parties to intercept Website users' communications.

83.     Thus, Defendant directly ignores the denial of consent from Website users who reject Defendant's use of tracking technologies and nonetheless enables the Third Parties' interception of users' communications from the Website.

## **CLASS ACTION ALLEGATIONS**

84.     Plaintiff seeks to represent a class of all individuals in California who visited the Website and either clicked "x" to close out of the banner or rejected Defendant's use of tracking technologies through the Website's cookie banner, who conducted searches, viewed specific products, or initiated the checkout process for selected products on the Website, and had their communications intercepted by the Third Parties as enabled by Defendant (the "Class").

85.     Plaintiff also seeks to represent a class of all individuals in California visited the Website, rejected Defendant's use of tracking technologies through the Website's cookie banner, who conducted searches, viewed specific products, or initiated the checkout process for selected products on the Website, and had their

communications intercepted by the Third Parties as enabled by Defendant (the "Rejection Subclass") (the Class and Subclass, together the "Classes").

86.    Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

87.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

88.    Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; Google, HubSpot, and Meta; any affiliate, parent, or subsidiary of Google, HubSpot, and Meta; any entity in which Google, HubSpot, and Meta has a controlling interest; any officer director, or employee of Google, HubSpot, and Meta; any successor or assign of Google, HubSpot, and Meta; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

89.    **Numerosity.** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in the Classes. Class Members can be readily identified from Defendant's records.

90.    **Typicality.** Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs, like all other members, visited Defendant's Website and had their confidential electronic communications intercepted by the Third Parties, as enabled by Defendant.

91.    **Adequacy.** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes. Plaintiff's interests are

coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

92.    **Common Questions of Law and Fact Predominate.** Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include, but are not limited to, the following: whether Defendant violated CIPA § 631 and/or § 632 and whether Plaintiff and the proposed Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

93.    **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

# CLAIMS FOR RELIEF
## COUNT I
**Violation Of The California Invasion of Privacy Act,**
**Cal. Penal Code § 631**

94.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

95.    Plaintiff brings this claim against Defendant individually and on behalf of the Classes.

96.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a Plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

> *Or*

> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

> *Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause

to be done any of the acts or things mentioned above in this section.

97.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

98.    The Third Parties' Tracking Code is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

99.    The Third Parties are "separate legal entit[ies] that offer[] [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes. Accordingly, Google, HubSpot, and Meta were a third party to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

100.   At all relevant times, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit.

101.   At all relevant times, the Third Parties used or attempted to use the communications intercepted by the Tracking Code to promote and improve their advertising platforms and/or services.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    28

102.    At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiff and Class Members' communications using the Third Parties' Tracking Code and to accomplish the wrongful conduct at issue here.

103.    Plaintiff and Class Members did not provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

104.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violation of CIPA § 631(a), and each seeks statutory damages of $5,000 for Defendant's violations of CIPA § 631(a).

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**

105.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

106.    Plaintiff brings this claim against Defendant individually and on behalf of the Classes.

107.    CIPA § 632(a) prohibits entities from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

108.    The Third Parties' Tracking Code are "electronic amplifying or recording device[s]."

109.    At all relevant times, the communications between Plaintiff and Class Members on one hand, and Defendant on the other, were confidential.

110.    At all relevant times, Defendant intentionally used the Third Parties' Tracking Code to record such confidential communications without Plaintiff and Class Members' knowledge or consent.

111.    When communicating with Defendant, Plaintiff and Class Members had an objectively reasonable expectation of privacy given that Defendant expressly said in large bold text that "**We Value Your Privacy**." Separate and apart from this, Subclass members who clicked "Reject All" button on the cookies banner had an even heightened expectation of privacy given the explicitly denied Defendant permission to use tracking technologies while they used the Website. Thus, Plaintiff and Class Members did not reasonably expect Defendant to record their communications with the Tracking Code (recording devices).

112.    Plaintiff and Class Members did not consent to Defendant's intentional use of an electronic amplifying or record device to record their confidential communications.

113.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for Defendant's violations of CIPA § 632(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the putative Classes, naming Plaintiff as the representative of the putative Classes, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class Members;

(b)    For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the putative Classes on all counts asserted herein;

(d)    For statutory damages in amounts to be determined by

the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For injunctive relief as pleaded or as the Court may deem proper; and

(g)    For an order awarding Plaintiff and the putative Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the proposed Classes, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: February 24, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/      Ines Diaz Villafana*
        Ines Diaz Villafana

Stefan Bogdanovich (State Bar No. 324525)
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:   (925) 407-2700
Email: sbogdanovich@bursor.com
          idiaz@bursor.com

**BURSOR & FISHER, P.A.**
Alec M. Leslie (*pro hac vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: aleslie@bursor.com

*Attorneys for Plaintiff*